UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EVELYN TAYLOR, | ) | CASE NO. 1:14CV1710 |
| Plaintiff, | ) ) | MAGISTRATE JUDGE |
| v. | ) ) | GEORGE J. LIMBERT |
| CAROLYN W. COLVIN[1], | ) ) | MEMORANDUM OPINION & ORDER |
| ACTING COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| Defendant. | ) ) ) | |

Evelyn Taylor ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin

("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her

applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

ECF Dkt. #1. For the following reasons, the Court AFFIRMS the ALJ's decision and DISMISSES

Plaintiff's complaint in its entirety with prejudice.

## I. PROCEDURAL AND FACTUAL HISTORY

Plaintiff filed her applications for DIB and SSI on July 14, 2011 alleging disability beginning

June 1, 2011 due to Sjogren Syndrome, tendonitis in both shoulders, osteopenia, missing one kidney,

athritis, depression, bipolar disorder, hemolysis, anxiety, attention deficit hyperactivity disorder

("ADHD"). ECF Dkt. #12 ("Tr.") at 279, 288. The SSA denied Plaintiff's applications initially

and on reconsideration. *Id*. at 106-173, 187-189. Plaintiff requested an administrative hearing, and

on December 13, 2012, an ALJ conducted an administrative hearing and accepted the testimony of

Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id*. at 35, 178-183,

241. On January 25, 2013, the ALJ issued a decision denying benefits. *Id*. at 10-29. Plaintiff

appealed the decision, and on June 24, 2014, the Appeals Council denied review. *Id.* at 1-6.

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security,
replacing Michael J. Astrue.

On August 5, 2014, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On January 21, 2015, Plaintiff, through counsel, filed a brief on the merits. ECF Dkt. #16. On April 6, 2015, Defendant filed a brief on the merits. ECF Dkt. #19.

**II.**    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

On January 25, 2013, the ALJ issued a decision finding that Plaintiff suffered from depression, anxiety, ADHD, hiatal hernia, Sjogen's disease, osteoarthritis, bilateral shoulder tendonitis, back pain, and thyroid disorder, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 17. The ALJ further determined that Plaintiff's impairments, individually and in combination, did not meet or equal any of the Listings. *Id*. at 17-19.

The ALJ proceeded to find that Plaintiff had the RFC to perform sedentary work except that she had to sit or stand every hour for five minutes; she could occasionally climb ramps or stairs, ladders, ropes and scaffolds; she could occasionally balance, stoop, kneel, crouch, or crawl; she had to avoid all exposure to extreme cold or extreme heat; she could perform work that does not involve the ability to understand, remember, or carry out detailed or complex instructions; she could perform work that does not involve working at a production pace, but could perform goal-oriented work; and she could tolerate only occasional changes to the routine work setting. Tr. at 19.

Based upon this RFC and the testimony of the VE, the ALJ concluded that Plaintiff could not perform her past relevant work as a home health aide, ticket taker or usher, but she could perform jobs existing in significant numbers in the national economy, including the representative occupations of a cashier II, small products assembler, and telephone solicitor. Tr. at 27-28. Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and she was not entitled to DIB or SSI. *Id.* at 28.

**III.**    **STEPS FOR ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.** **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V. RELEVANT MEDICAL HISTORY AND TESTIMONY

### A. MEDICAL HISTORY

The Court discusses only the medical evidence relating to Plaintiff's mental health impairments as Plaintiff does not challenge the ALJ's evaluation of her physical impairments and his decision relating to her physical impairments. ECF Dkt. #16 at 3.

On August 10, 2011, Certified Nurse Practitioner Mary Lieder completed a mental residual functional capacity ("MRFC") assessment indicating a diagnosis of major depressive affective disorder and opining that Plaintiff had marked limitations in remembering locations and work-like procedures, and in understanding and remembering very short and simple and detailed instructions, Tr. at 531. She also opined that Plaintiff was markedly limited in: maintaining concentration and attention for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms; ability to work at a consistent pace with a standard number and length of rest periods; ability to interact with the general public; ability to ask simple questions or for assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and in the ability to set realistic goals or make plans independently of others. *Id*. at 531-533. CNP Lieder further opined that Plaintiff would be absent from work four or more times per month due to her symptoms and she had extreme limitations in accepting instructions and responding appropriately to criticism from

supervisors and in being aware of normal hazards and taking appropriate precautions.  *Id*. at 532-533.  CNP Lieder also indicated that Plaintiff would not be able to manage benefits in her own best interest because she has poor coping skills and a poor history of managing her daily living activities. *Id.* at 533.

August 2011 through November 2011 progress notes from Charak Center indicated that Plaintiff participated in therapy with licensed social worker Ms. Stevenson.  Tr. at 970-979.  In August 2011, Plaintiff reported continued depression and irritability every once in a while.  *Id*. at 979.  In September 2011, Plaintiff indicated anxiety concerning her children.  *Id*. at 977.  Ms. Stevenson reported that she had been off of her Zoloft and Strattera for several weeks.  *Id*. at 972.

On October 3, 2011, Dr. Pickholtz conducted a psychological interview for the agency.  Tr. at 541.  Plaintiff informed Dr. Pickholtz that her depression was the main problem keeping her from working.  *Id.* at 542.  She reported that she was living with her mother and her three children aged 11, 7 and 16 months old.  *Id*.  She indicated that her youngest child has cerebral palsy.  *Id*.

Plaintiff reported symptoms of depression and mood swings beginning in 2006 and worsening over the past two years.  Tr. at 542.  She explained that she was treated for depression, anxiety and mood swings with medication until November 2006 and then stopped and began treating again with therapy and medications beginning last year and continuing through the time of the evaluation.  *Id*.  Plaintiff reported prior involuntary hospitalizations.  *Id.*

Dr. Pickholtz observed signs of aberrant behavior during the evaluation and he noted that Plaintiff's motivation and cooperation during the evaluation was below average and he noted that she had tendencies toward exaggeration.  Tr. at 544.  He found that her flow of conversation was normal, her affect was a little constricted, her mood was a little depressed, and her pace and persistence was low average.  *Id*. at 545.  He opined that with current psychiatric treatment, he believed that Plaintiff's affective complaints would remain within the severe range of impairment. *Id.* He also reported that her self-esteem was within the below average range and the impact of residual depression relative to her daily activities appeared to be within the severe range.  *Id*.  Dr. Pickholtz opined that Plaintiff's anxiety was mild with the medications that she was taking.  *Id*.

Dr. Pickholtz found no indication of hallucinations and Plaintiff reported no delusions or thought disturbances. Tr. at 545-546. He opined that Plaintiff was well-oriented, but her recall of long-term history was low average and her overall intellectual functioning appeared to be in the moderately retarded range based upon his mental status examination. *Id*. at 546. He did note a real discrepancy between Plaintiff's responses to his evaluation and the quantity and quality of her daily living activities and premorbid levels of intellectual functioning such as her prior levels of academic achievement, her ability to pass the written portion of the driver's license test, and her work history. *Id*. He opined that this lack of consistency was related to motivational levels and exaggeration. *Id*. at 547. He also opined that Plaintiff's level of attention and persistence, which fell into the severe range of impairment, were due to exaggeration. *Id*.

Dr. Pickholtz diagnosed Plaintiff with mild ADHD, not otherwise specified ("NOS"), mild anxiety disorder, and moderate depressive disorder, NOS, with exaggeration and in partial remission. Tr. at 548. He rated her global assessment of functioniong ("GAF") at 58, indicating moderate symptoms. *Id*. He opined that she was mildly impaired in understanding and following instructions, mild to no more than moderate impairment in maintaining attention and performing simple repetitive tasks, not impaired in relating to others, and problematic but not work preclusive ability to withstand the stress and pressures of daily work activities. *Id.* at 549.

On November 3, 2011, a social worker at Charak Center reported that Plaintiff was not compliant with her medications or her treatment. Tr. at 972-973. Nevertheless, Plaintiff's mental status examination indicate that she was oriented, had fair judgment, normal impulse control, full affect, logical thought process, no delusions or hallucinations, and average eye contact, motor activity and speech. *Id*. at 971. Her depressive symptoms, anxiety, panic attacks and irritability were all reported as mild, and she reported that she was sleeping better. *Id*. at 970.

Medical records from Lutheran Hospital dated March 18, 2012 show that Plaintiff presented for worsening depression which led her to overdose on 8 tablets of Nabumetone 750 mg that she was taking for inflammation. Tr. at 555. Plaintiff explained that her main stressors were living with her mother and sister and her youngest child who has cerebral palsy. *Id.* It was noted that this was Plaintiff's first hospitalization for psychiatric conditions except for one prior overdose as a preteen

for which she was not hospitalized.  *Id.* Dr. Bowers indicated that Plaintiff's judgment was fair to poor with minimal insight.  *Id.* at 558-559.  Plaintiff indicated that she was treating at the Charak Health and Wellness Clinic at Marymount Hospital with nurse practitioners and a counselor.  *Id.* at 555.  Plaintiff indicated that she could not guarantee against another suicide attempt if she were not admitted to the hospital.  *Id.*  She was admitted at Lutheran in the Mood Disorder Unit until March 20, 2012 and received increased dosages of her medications and group therapy.  *Id.* at 556.  Plaintiff was thereafter focused on getting discharged and she was released although it was felt that she would have benefitted from one or two more days of hospitalization.  *Id.* at 552.

Plaintiff was discharged from Lutheran with medications and diagnoses of major recurrent depressive disorder and moderate to severe post-traumatic stress disorder, and she was rated a 55 GAF, indicative of moderate symptoms.  *Id.*  By the time of discharge, it was reported that Plaintiff had "significant subjective improvements" including a brightening affect, more interaction, good appetite, good sleep, and good group participation.  *Id.* at 552.  Plaintiff's concentration and energy were improved and her suicidal ideation had "completely resolved."  *Id.*

On May 12, 2012, Dr. Aggarwal, M.D. completed a psychiatric evaluation of Plaintiff at Signature Health.  Tr. at 899. Plaintiff reported that she began feeling depressed when she was a child after her father suffered a stroke and later became quadriplegic.  *Id.*  She indicated that she has many stressors in her life and she becomes overwhelmed, depressed and irritated very easily.  *Id.* She stated that caring for her three children is overwhelming at times, as her eight year-old daughter has anxiety, depression, ADHD and anger issues, and her two year-old son has cerebral palsy.  *Id.* She lived with her mother and wanted to move out, but finances are tight.  *Id.*  She also reported health stressors as she suffered flare-ups of whole body pain from Sjogren's Syndrome and various myalgias.  *Id.*  She also had a pending court date for unpaid income tax and child protective services are involved with her because of her suicide attempt in front of her twelve year-old son.  *Id.* at 900. Plaintiff explained that she was treating at Charak Health Clinic but stopped going a few months ago because she was not happy with the care she received.  *Id.* at 901.

Dr. Aggarwal noted that Plaintiff made good eye contact, had clear and normal speech, had logical and coherent thought process, depressed mood, full affect, calm and cooperative behavior,

no impairment in orientation, memory, attention or concentration and had fair insight and judgment. Tr. at 903. He indicated that Plaintiff denied delusions, thoughts of hurting herself or others, and denied auditory or visual hallucinations. *Id.* He diagnosed Plaintiff with major depressive disorder, PTSD, ADHD inattentive type, and anxiety disorder, NOS. *Id.* at 904. He rated Plaintiff's GAF as 50-60, indicative of moderate symptoms. *Id.* He increased Plaintiff's Zoloft back to where Lutheran Hospital had increased it upon Plaintiff's discharge as Plaintiff had reduced the dosage when she left the hospital. *Id.* He also continued Plaintiff's Strattera and Ativan for anxiety and instructed Plaintiff to continue the counseling that she had already began with Signature Health. *Id.*

Individual counseling progress notes from Timothy Shaughnessy, MSW, LISW-S, LICDC indicate that Plaintiff presented on June 19, 2012 in an anxious mood concerning her mother, her children, and various service providers from an in-home program that she wanted to stop coming to the house. Tr. at 736. Mr. Shaughnessy indicated that Plaintiff had good insight and appeared to release some stress through the counseling. *Id.* July 5, 2012 progress notes indicate that Plaintiff was anxious about living at home and about the service providers giving her too many services. *Id.* at 734. Plaintiff also met with Mr. Shaughnessy on July 20, 2012 and August 3, 2012 for counseling services. *Id.* at 735-737.

Plaintiff followed up with Dr. Aggarwal on July 14, 2012 and reported that her mood at "fine" at a score of 5 on a 10-point scale. Tr. at 909, 1032. She indicated that the medications were helping her mood and anxiety and they discussed her stressors. *Id.* at 909–910. Dr. Aggarwal found that Plaintiff made good eye contact, smiled appropriately, had clear speech, logical and coherent thought process, no delusions or hallucinations, full affect, calm and cooperative behavior, no impairment in cognition, and fair insight and judgment. *Id.* at 910. Dr. Aggarwal's diagnoses remained the same as on his initial psychiatric evaluation and he rated Plaintiff's GAF as 50-60. *Id.* He continued Plaintiff's medications, but increased her Strattera dosage. *Id.* at 911.

On October 6, 2012, Plaintiff followed up with Dr. Aggarwal, having last seen him in July of 2012. Tr. at 1021. She told Dr. Aggarwal that she stopped taking all of her medications for a month in August because she was having physical problems and feeling emotionally overwhelmed. *Id.* Plaintiff reported feeling overwhelmed because of her physical health and taking care of her

children and she was sleeping a lot. *Id*. She told Dr. Aggarwal that for the past month, she had increased the dosage of Zoloft from 150 mg to 200 mg, she was taking Strattera daily, but she stopped taking Ativan. *Id*. Plaintiff also reported that her panic attacks had improved as she was having them only once or twice per week. *Id.*

Dr. Aggarwal's mental status examination showed that Plaintiff maintained good eye contact, smiled appropriately, had clear and normal speech, normal thought content, no suicidal thoughts or hallucinations, coherent and logical thought process, full affect, calm and cooperative behavior and she had no impairment in orientation, memory, attention or concentration. Tr. at 1022. Plaintiff described her mood as irritable and Dr. Aggarwal observed her mood as such. *Id*. He diagnosed major depressive disorder, PTSD, ADHD predominantly inattentive type, and anxiety disorder NOS, and he rated her GAF at 50 to 60. *Id.* He continued Plaintiff's Zoloft dosage at 200 mg, continued the Strattera, and discontinued Ativan. *Id.* He also recommended the continuation of counseling and the outside services provided to Plaintiff. *Id*. at 1023.

On October 6, 2012, Dr. Aggarwal completed a MRFC assessment of Plaintiff, opining that she was moderately limited in: remembering locations and work-like procedures, understanding, remembering, and carrying out very short and simple instructions; making simple work-related decisions; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; and the ability to travel in unfamiliar places or use public transportation. *Id*. at 1018-1019. Dr. Aggarwal also concluded that Plaintiff was markedly limited in: understanding, remembering, and executing detailed instructions; maintaining concentration and attention for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms; ability to work at a consistent pace with a standard number and length of rest periods; ability to interact with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to set

realistic goals or make plans independently of others.  *Id*.  Dr. Aggarwal opined that Plaintiff was unemployable and her limitations were expected to last for a period of twelve months or more.  *Id.* at 1019.

On December 1, 2012, Plaintiff followed up with Dr. Aggarwal for medication management and she reported that she was doing okay.  Tr. at 1039.  She reported being worried about her disability hearing and her physical health.  *Id*.  She indicated that her children were doing well, including her eight year-old daughter who was now on medication for her ADHD and oppositional defiance disorder.  *Id.*  She rated her mood as a 6 out of 10 and she reported sleeping and eating more, and denied suicidal thoughts.  *Id.*  She also stated that her medications were helping her mood and meeting with Mr. Shaughnessy for counseling was helping her.  *Id*.

Dr. Aggarwal's mental status examination showed that Plaintiff maintained good eye contact, smiled appropriately and made appropriate jokes, had clear and normal speech, normal thought content, no suicidal thoughts or hallucinations, coherent and logical thought process, full affect, calm and cooperative behavior and she had no impairment in orientation, memory, attention or concentration.  Tr. at 1040.  Plaintiff described her mood as irritable and Dr. Aggarwal observed her mood as such.  *Id*.  He diagnosed major depressive disorder, PTSD, ADHD predominantly inattentive type, and anxiety disorder NOS, and he rated her GAF at 50 to 60.  *Id.*  He continued Plaintiff's Zoloft dosage at 200 mg and continued the Strattera.  *Id.*  He also recommended the continuation of counseling and the outside services provided to Plaintiff.  *Id*. at 1041.

## B.  TESTIMONIAL EVIDENCE

At the December 13, 2012 hearing before the ALJ, Plaintiff testified that she and her three children were living with her mother and older sister in her mother's house.  Tr. at 40.  She reported that her mother takes care of her children half of the time when she is unable to do so because of her impairments.  *Id*. at 41.  She indicated that her sister, who is disabled, also helps with caring for her children.  *Id*.  She explained that 85% of the day, she is not feeling well and she is lying down.  *Id.*  She stated that she is moody, does not want to be around anyone, and she always had chest pain due to a hiatal hernia.  *Id*.  Plaintiff indicated that she also has shoulder pain, constant fatigue, blurred vision from Sjogren's Syndrome, and depression.  *Id.* at 41-42.

-10-

She testified that the last time she worked was in October of 2007 doing home healthcare and had worked for a couple of months when she began experiencing stiffness and problems walking. Tr. at 42. She then went to the doctor, who eventually diagnosed her with Sjogren's Syndrome. *Id.* at 43. She also had a hiatal hernia in the fall of 2007 in the middle of her chest, which felt like she was having a heart attack. *Id.* Plaintiff also reported prior employment from 2002 through 2006 as a nurse's aid for Metrohealth. *Id.* at 44. She testified that she left that job because she was in an abusive relationship with her second child's father and he tried to get her fired, so she left the job so he would not find her there. *Id.* She said at that point, she took a break from working for a year and tried to return to work in 2007 but found that she was unable to do the work that she used to do. *Id.* at 45.

Plaintiff complained that the biggest reason that she could not work was because of her depression. Tr. at 47. She reported that she almost died when she last tried to commit suicide and she cannot deal working with people, gets irritated very quickly and she does not want to go out of her house or talk to people, except for her kids. *Id.* She stated that she has no friends and does not even participate in her children's school activities. *Id.* She reported that her relationship with her mother is better since her overdose attempt. *Id.* at 47-48. Plaintiff testified that she cannot concentrate and her memory is not good. *Id.* at 49.

Plaintiff identified her anxiety as her second reason for her inability to work, indicating that she gets upset too easily and has crying spells. Tr. at 52. She identified her hiatal hernia as the third reason for her inability to work. *Id.* Plaintiff and the ALJ also discussed her Sjogren's Syndrome, osteoporosis, shoulder tendonitis, back pain, dental problems, nightmares, and GERD. *Id.* at 52-60.

Upon questioning from her attorney, Plaintiff testified that her depression has worsened in the past year due to the stress of caring for her children and living with her mother and sister. Tr. at 61. She explained that she sleeps more and suffers from more pain as a result. *Id.* at 62. She also has trouble maintaining a schedule. *Id.* at 64-67.

 The VE then testified.  The ALJ asked the VE to assume a female hypothetical individual with the same age, education and background as Plaintiff, with the limitations of: lifting and carrying up to 10 pounds; standing/walking 2 out of 8 hours per day, sitting for 6 out of 8 hours per day, with

a sit/stand option every hour for 5 minutes; occasionally climbing ramps, stairs, ladders, ropes and scaffold; occasionally balancing, stooping, kneeling, crouching, and crawling; avoidance of all exposure to extreme cold and heat; performing no work that requires understanding, remembering or carrying out detailed or complex instructions; no production pace, but she can perform goal-oriented work; and she can tolerate only occasional changes to the routine work setting.  *Id.* at 68-69.  The VE responded that such an individual could not perform any of Plaintiff's past relevant work, but she could perform a number of other jobs existing in significant numbers in the national economy, including the representative jobs of cashier II, small products assembler, and telephone solicitor.  *Id.* at 69-70.

The ALJ presented a second hypothetical individual to the VE, asking the VE to assume the same hypothetical individual as the first hypothetical individual, but adding that the second hypothetical person could not be exposed to hazards, could have no contact with the public, and is limited to only speaking or signaling when dealing with supervisors or co-workers.  Tr. at 70-71.  The VE responded that only the small products assembler job would be available for the second hypothetical individual.  *Id.* at 71.

The ALJ presented a third hypothetical individual to the VE, asking the VE to assume the same hypothetical individual as the second hypothetical individual, but adding that the third hypothetical person would be off task 20 percent of the time.  Tr. at 71.  The VE responded that no jobs would be available for the third hypothetical individual.  *Id.* at 71.

Plaintiff's counsel thereafter questioned the VE, asking the VE to assume a fourth hypothetical individual who was the same as the ALJ's first and second individuals, but she had no production goals rather than the ALJ's hypothetical limitation of not being on a production line or having only goal-oriented tasks.  Tr. at 73  The VE responded that no jobs would be available for such individuals.  *Id.*  The VE also responded to counsel's question concerning an acceptable rate of absenteeism, testifying that an acceptable rate was no more than once a month.  *Id.*

## VI.    LAW AND ANALYSIS

### A.    TREATING PSYCHIATRIST ASSESSMENT

Plaintiff first alleges that the ALJ committed error when he failed to properly evaluate the medical assessment of Dr. Aggarwal, Plaintiff's treating psychiatrist.  ECF Dkt. #16 at 8-11.  For the following reasons, the Court finds that the ALJ minimally, but properly applied the treating physician rule and substantial evidence supports his decision to attribute less than controlling weight to Dr. Aggarwal's assessment.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security.  Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians.  SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).  A presumption exists that the opinion of a treating physician is entitled to great deference.  *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  *Wilson,* 378 F.3d at 544.  When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion:  the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.  *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*  This allows a claimant to understand how his case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' "  *Wilson,* 378 F.3d at 544 quoting *Snell*

-13-

*v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

Here, the ALJ addressed Dr. Aggarwal's MRFC assessment and noted that CNP Lieder's assessment was similar to that of Dr. Aggarwal. Tr. at 20. The ALJ stated that he gave little weight to both opinions, reasoning first that "Dr. Aggarwal only provides medication management to the claimant." *Id*. at 21.

The Court finds that this statement is inadequate for attributing less than controlling weight to the assessment of Dr. Aggarwal. Dr. Aggarwal's progress notes document Plaintiff's symptoms at each visit, and show that while he did provide medication management for Plaintiff, he also spent time talking with Plaintiff at each visit, assessed her mental status, and provided diagnoses, a GAF, and a treatment plan that included both medication management and treatment with other services, such as community services and individual counseling. *Id*. at 1032-1034, 1036-1041.

-14-

However, the ALJ also reasoned that he attributed less than controlling weight to Dr. Aggarwal's assessment because the evidence of record did not support the extreme limitations that he opined it showed largely normal or mild findings on mental status examinations, other than during periods where Plaintiff was non-compliant with medication and/or counseling. Tr. at 21. The ALJ's earlier review of the medical evidence concerning Plaintiff's mental impairments provides substantial evidence to support such a finding. For instance, the ALJ noted that Plaintiff received intermittent mental health treatment from Charak Center, and when she did go to treatment there on November 3, 2011, she reported that she had not taken her prescribed medications for several weeks and she was described as non-compliant with medications, treatment and appointments. *Id*. at 19, citing Tr. at 971-973. The ALJ cited to Plaintiff's March 18-March 20, 2012 hospitalization for an attempted suicide. Tr. at 19, citing Tr. at 932-957. He noted that Plaintiff took an overdose of prescribed medication and took a bus to the emergency room because she began to feel dizzy. *Id*. He indicated that Plaintiff primarily reported situational stressors involving her family, her living situation and her finances, and Plaintiff had significant improvement in her symptoms once her medication regimen was adjusted and she participated in therapy. *Id*. at 19, citing Tr. at 933. The ALJ noted that following this hospitalization, progress notes throughout April of 2012 from Plaintiff's primary care physician, Dr. Bloom, show that she presented for physical problems, as well as for depression and status-post suicide attempt. Tr. at 961. The ALJ noted Dr. Bloom's findings on April 9, 2012 upon examination that Plaintiff had normal speech, affect, thought and appearance and she was changing her mental health provider but was seeing a counselor. *Id*. Plaintiff again presented to Dr. Bloom on April 19, 2012 for her depression and other conditions and he noted upon examination that she had normal thoughts, speech, affect, and appearance. *Id*. at 960. Dr. Bloom examined Plaintiff on April 27, 2012 for her conditions, including depression, and he found her in no acute distress. *Id*. at 959.

The ALJ also cited to Dr. Aggarwal's progress notes which included his initial psychiatric evaluation of Plaintiff on May 12, 2012 that her primary complaint was depression secondary to situational stressors and Plaintiff reported panic attacks for the first time. Tr. at 20, citing Tr. at 899. The ALJ indicated that Dr. Aggarwal noted a positive toxicology screen for marijuana on the date

-15-

of Plaintiff's admission to the hospital for a suicide attempt, although Plaintiff denied to him that she had ever smoked marijuana.  *Id.* at 902.  The ALJ also pointed out that Dr. Aggarwal's mental status examination of Plaintiff showed good eye contact, clear and normal speech, logical and coherent thought process and full affect, fair insight and judgment, and normal orientation, memory, attention and concentration.  *Id.* at 20, citing Tr. at 903.  The ALJ noted Dr. Aggarwal's diagnoses of Plaintiff with major depressive disorder, PTSD, ADHD and anxiety disorder NOS, and his rating of her GAF as 50-60, indicative of moderate symptoms.  *Id.*  He also noted Dr. Aggarwal's approval of Plaintiff's increase of her Zoloft dosage and he referred her for counseling.  *Id.* at 20, 904.

In addition, the ALJ noted Dr. Aggarwal's July 14, 2012 progress notes indicating Plaintiff's report that her mood was "fine," and her medications were helping with her mood and anxiety, although her situational stressors were continuing.  Tr. at 20, citing Tr. at 909.  The ALJ pointed out that Dr. Aggarwal's mental status examination of Plaintiff showed mild findings, with good eye contact, appropriate smiling, clear, normal speech, logical and coherent thought process, full affect, calm and cooperative behavior, no impairment in memory, orientation, attention or concentration, and fair insight and judgment.  *Id.* at 910.  Plaintiff's GAF was assessed at 50 to 60.  *Id.*

The ALJ also noted Dr. Aggarwal's October 6, 2012 note that he examined Plaintiff and she acknowledged to him that she had stopped taking her medications for a month in August.  *Id.* at 20, citing Tr. at 1021.  The ALJ cited to Dr. Aggarwal's note which indicated that Plaintiff's mental health status examination was unremarkable for the most part, with normal orientation, memory, attention, concentration.  *Id.* at 20, citing Tr. at 1021, 1040.  Dr. Aggarwal's other progress notes indicate the same normal mental status examination results on December 1, 2012.  *Id.* at 1029, 1033.

In addition, the ALJ cited to Dr. Pickholtz's evaluation of Plaintiff wherein he found that Plaintiff tended to exaggerate her symptoms and limitations and concluded that Plaintiff was mildly impaired in understanding, remembering and carrying instructions, moderately impaired in maintaining attention and concentration to perform simple and multi-step tasks, not severely impaired in interacting with supervisors and co-workers, and not severely impaired in responding to work pressures, although her psychiatric conditions were problematic but not work preclusive.  Tr. at 19-20 at 547-548.  The ALJ gave substantial weight to this opinion, although he found that

-16-

Plaintiff had a greater ability to function than did Dr. Pickholtz based upon the mild symptoms and normal mental status examinations following his opinion. *Id.*

Plaintiff asserts that the ALJ violated the treating physician rule in rejecting Dr. Aggarwal's statements because he failed to follow *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 376 (6th Cir. 2013) and SSR 96-2p as he failed to first analyze the opinions for controlling weight status and to thereafter weigh the six factors for determining the weight that he would attribute to Dr. Aggarwal's opinions.  ECF Dkt. #16 at 10.

In *Gayheart*, the Sixth Circuit Court of Appeals emphasized that the social security regulations require that two separate analyses occur when evaluating a treating source's opinion. 710 F.3d at 375-377.  The ALJ must first consider whether to give the treating source's opinion controlling weight by determining if it is well-supported by clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. *Id.*  Then, when the ALJ decides not to give controlling weight to the opinion, the ALJ moves on to determine the weight that the opinion should receive based on the regulatory factors. *Id.*

Courts in this District have reasoned that *Gayheart* did not present a new interpretation of the treating source doctrine, but rather reinforced the prior holdings of the Sixth Circuit.  *Aiello–Zak v. Comm'r of Soc. Sec.*, No. 5:13–CV–987, 2014 WL 4660397, at *4 (N.D.Ohio Sept.17, 2014) (citing *Rogers v. Comm'r*, 486 F.3d 234 (6th Cir.2007); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.2009); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir.2009)).  The Sixth Circuit has also held that if "the ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template." *Id.* at *5 (citing *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 427–28 (6th Cir.2014) ).  However, "the reasons must be supported by the evidence in the record and sufficiently specific to make clear the weight given to the opinion and the reasons for that weight." *Brasseur v. Comm'r of Soc. Sec.*, 525 F. App'x 349, 351 (6th Cir.2013) (citing *Gayheart*, 710 F.3d at 376).

Moreover, Courts in this District have upheld ALJ determinations that did not comply with *Gayheart*.  The Court in *Phillips v. Commissioner of Social Security*, 972 F.Supp.2d 1001 (N.D.

-17-

Ohio 2013) faced a brief analysis similar to the ALJ in this case and nevertheless found that the treating physician rule was adequately met.

The treating source in *Phillips* had completed a check box medical source statement concerning Phillips' limitations resulting from peripheral arterial disease.  972 F.Supp.2d at 1005. The doctor had checked the relevant symptoms on the form that Phillips was experiencing and opined standing, walking, sitting, and lifting limitations and opined that Phillips would have to elevate his legs frequently during an eight-hour workday.  *Id.*  In addressing this statement, the ALJ stated that he attributed little weight to it because it was "conclusory and is not supported by the record."  *Id.* at 1006.  Phillips asserted that the ALJ's analysis did not meet the regulations or the Court's standard in *Gayheart.  Id.*

Despite the fact that the ALJ did not analyze the determination of controlling weight separately, the *Phillips* Court explained that the ALJ's finding that the opinion was conclusory and unsupported by the record,

> coupled with the ALJ's conclusion that "[t]here are no [office or treatment] records" (*id.*) to support certain claimed physical conditions, this is the functional equivalent of a determination by the ALJ that the treating physician's opinion (expressed in mere check marks on a form) need not be given controlling weight under the regulation because it was *not* "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and *was* "inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 416.927(c)(2). In other words, the opinion of Dr. Dhyanchand was so "patently deficient" that it could not be credited. *Cole,* 661 F.3d at 940; *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001) (even though "medical opinions and diagnoses of treating physicians are entitled to great weight [,]" "the ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation' ") (quoting *King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984)). Further, although the ALJ's articulation of his reasons was very brief, it was clear and made specific reference to exhibits in the record by way of support. Finally, although plaintiff argues that the ALJ failed to make a controlling weight determination before he applied the factors of specialization of the source and length of the treatment relationship, this is not so, as revealed by a simple review of the ALJ's opinion: the declaration that Dr. Dhyanchand's opinion would be given little weight was made prior to the additional conclusions that he was not a specialist and had a short treatment relationship with plaintiff.

*Phillips*, 972 F.Supp.2d at 1007-1008.

In *DeGarmo v. Commissioner of Social Security*, No. 12CV2740, 2014 WL 903109 (N.D. Ohio Mar. 7, 2014), the Court cited to *Phillips* in finding that the ALJ's violation of the treating physician rule was harmless error as the treating physician's opinions were patently deficient.  The

-18-

ALJ in *DeGarmo* had attributed no weight to the opinions of Dr. Ramirez, DeGarmo's psychiatrist at Murtis, who had completed a work ability form in a "cursory" manner and concluded that DeGarmo was unemployable and could not sustain employment eight hours a day, five days a week because she reacted with anger to stress and could only concentrate for short periods of time.  *Id.* at *7-*8.  The *DeGarmo* Court noted that Dr. Ramirez's opinion was mostly dependent upon the evaluations by other sources, including nurses and APNs, and the opinion did not refer to Dr. Ramirez's treatment notes for support, making evaluation of the treatment notes that Dr. Ramirez relied upon speculative for an adjudicator.  *Id.* at *8.  The Court concluded that:

> similar to the reasoning employed by Judge Lioi in *Phillips*, any error in how the ALJ complied with the articulation of "good reasons" requirement associated with denying controlling weight to the opinion of a treating source is harmless because the opinion here was so patently deficient that the Commissioner could not possibly credit it. The ALJ's stated finding that Dr. Ramirez's opinion was entitled to no weight is well-supported by facts, cited above, which show that the brief conclusions on limitations are not supported by any medically acceptable clinical and laboratory diagnostic techniques, nor are they consistent with the other substantial evidence in the record. Further, the fact that the ALJ conducted much of his analysis of the limitations evidence immediately prior to assigning weight to the various opinions in this matter should not obscure the fact that a detailed analysis, capable of meaningful judicial review, was conducted by the ALJ here, and that it is sufficient to show that any error in applying the good reasons requirement of the treating physician rule to Dr. Ramirez was harmless.

*Id.* at *9.

Similarly in this case, the ALJ reviewed the treatment and examining records concerning Plaintiff's mental health conditions and he indicated that he gave "little weight" to the assessment of Dr. Aggarwal.  Tr. at 20-21.  He explained that Dr. Aggarwal's severe limitations for Plaintiff were undermined by the evidence of record that showed largely normal or mild findings on mental status examinations.  *Id.* at 21.  The ALJ cited to Dr. Aggarwal's own progress notes, the findings of Dr. Bloom after Plaintiff's hospitalization as support for his determination to attribute less than controlling weight to Dr. Aggarwal's assessment.  The ALJ's review of treatment notes and other medical reports indicates that Dr. Aggarwal's assessment of such severe limitations for Plaintiff opinions was inconsistent with the other evidence of record.  Thus, while he did not specifically state the separate analysis for attributing less than controlling weight, the ALJ's analysis implied that he was not attributing controlling weight to Dr. Aggarwal's assessment and the ALJ adequately

-19-

explained why he was not doing so and substantial evidence supported his determination.

### B.    ALJ'S MENTAL RFC DETERMINATION

Plaintiff also asserts that the ALJ's mental RFC for her is erroneous because the ALJ failed to include her moderate impairment in social functioning when he determined her mental RFC. ECF Dkt. #16 at 11-12. The Court finds no merit to this assertion.

At Step Three, the ALJ in this case did find that Plaintiff had moderate difficulties in social functioning. Tr. at 14.  The ALJ noted at this Step that state agency consultants found that Plaintiff had no limitations in social functioning, she was described by treatment providers as generally cooperative, and she was never fired for problems getting along with other people. *Id.* The ALJ also explained at this Step that the limitations identified in the paragraph B criteria are not a RFC assessment but are used to rate the severity of the impairments at Steps 2 and 3 and the RFC assessment at Steps 4 and 5 required a much more detailed assessment. *Id.* at 15.

Plaintiff relies upon the ALJ's Step Three finding of moderate difficulties in social functioning as support for her assertion that the ALJ's RFC for her at Step Four should have included social functioning restrictions.  However, it is well established that the paragraph B criteria used at steps 2 and 3 of the sequential analysis is "not an RFC assessment." SSR 96–8p 1996 WL 374184, at *4. "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorder listings in 12.00 or the Listings of Impairments." *Id.* Because "[t]he RFC describes 'the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from,' " *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir.2007 ) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir.2002)), the ALJ's inquiry is necessarily broader during the RFC assessment and must account for "all the relevant evidence in [the] case record." 20 C.F.R. § 416.945.  Accordingly, the ALJ in the instant case did not err in failing to include specific limitations relating to Plaintiff's social functioning in his RFC even though he found moderate limitations in social functioning in his paragraph B criteria at Steps 2 and 3. *See Mitchell v. Comm'r of Soc. Sec.*, No. 1:14CV1307, 2016 WL 304212, at *6 (W.D. Mich. Jan. 26, 2016)(claimant's argument not meritorious in asserting that

ALJ erred in finding at paragraph B criteria at Step 3 that he had mild to moderate limitation in ability to concentrate and not including limitation in RFC at Step 4 as paragraph B criteria are not an RFC assessment); *Koster v. Colvin*, No. 1:13CV2719, 2015 WL 413795, at *5 (N.D. Ohio Jan. 30, 2015), citing and quoting SSR 96-8p, *Griffeth*, 217 F'Appx. at 429; *Howard,* 276 F.3d at 240; 20 C.F.R. § 416.945 (claimant's objections not well-taken that ALJ had to include limitation as to concentration and persistence in RFC because he found mild to moderate limitations in concentration and persistence in paragraph B criteria at Steps Two and Three); *Pinkard v. Comm'r of Soc. Sec.*, No. 1:13CV1339, 2014 WL 3389206, at *10 (N.D. Ohio July 9, 2014)(ALJ does not have to include paragraph B finding of moderate difficulties in concentration, persistence and pace in his Step Four and/or Step Five RFC findings).

**VII.    CONCLUSION**

  For the foregoing reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety with prejudice.


DATE: February 26, 2016

       */s/George J. Limbert*
       GEORGE J. LIMBERT
       UNITED STATES MAGISTRATE JUDGE
